UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

|  |  |
|---|---|
| IN RE APPLICATION OF THE<br>UNITED STATES OF AMERICA<br>FOR AN ORDER AUTHORIZING THE<br>INSTALLATION AND USE OF PEN<br>REGISTERS AND TRAP AND TRACE<br>DEVICES AND ACQUISITION OF CELL-SITE<br>INFORMATION | MISC. NO. 2:16cm3073-SRW<br><br>**Filed Under Seal** |

## APPLICATION

The United States of America, moving by and through Verne Speirs, Assistant United States Attorney for the Middle District of Alabama, its undersigned counsel, respectfully submits under seal this *ex parte* application for an order pursuant to 18 U.S.C. §§ 3122-24 and 18 U.S.C. § 2703(d), authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") on Verizon cell phone number (334) 524-0720 with listed subscriber John Meadows ("**TARGET CELL PHONE 1**") and the acquisition of certain approximate location information for **TARGET CELL PHONE 1**, and other dialing, routing, and signaling information that may be associated with communications to or from **TARGET CELL PHONE 1**, as described in Attachment A to the proposed Order, in connection with a criminal investigation conducted by the Drug Enforcement Administration ("DEA") of Marquis Lanez MILLER ("**MILLER**") and others, regarding possible violations of 21 United States Code Sections 841(a)(1) and 846. In support of this application, the United States asserts:

### LEGAL BACKGROUND

1. The Court may authorize the installation and use of pen-trap devices to collect prospective dialing, routing, signaling and addressing information associated with wire and

electronic communications, not including the contents of any communication, pursuant to 18 U.S.C. §§ 3122-24. The Court may order a cell phone provider to disclose records or other information relating to the provider's subscribers pursuant to 18 U.S.C. §§ 2703(c)(1) and (d). Based on the combined authority of these statutes, the United States seeks prospective location information and other dialing, routing, signaling and addressing information concerning communications originating or terminating from the cell phone.

2. 18 U.S.C. § 3123(a)(1) gives the Court the authority to authorize the installation and use of pen-trap devices anywhere within the United States, where the Court finds that an attorney for the Government has certified to the Court that the information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation. Under 18 U.S.C. § 3122(b), an application for the authorization of a pen-trap device must include three elements: (1) "the identity of the attorney for the Government or the State law enforcement or investigative officer making the application"; (2) "the identity of the law enforcement agency conducting the investigation"; and (3) "a certification by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency." 18 U.S.C. § 3122(b).

3. The undersigned applicant is an "attorney for the government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure. The law enforcement agency conducting the investigation is the DEA.

4. In the next section of this application, the applicant will certify that the information likely to be obtained through this order is relevant to this ongoing criminal investigation.

5. Verizon Wireless is the provider of electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or remote computing services, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under 18 U.S.C. §§ 3122-24 and 18 U.S.C. § 2703(d) to require Verizon Wireless to disclose the items described in Section II of Attachment A.

6. A court order under 18 U.S.C. § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records or other information described in Section II of Attachment A are relevant and material to an ongoing criminal investigation.

## RELEVANT FACTS

7. A cellular telephone, or cell phone, is a mobile device that transmits and receives wire and electronic communications. Individuals using cell phones contract with service providers, who maintain antenna towers covering specific geographic areas. In order to transmit or receive calls and data, a cell phone must send a radio signal to an antenna tower that, in turn, is connected to a cellular service provider's network.

8. In addition to a unique telephone number, each cell phone has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cell phone could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile

Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cell phone to a cellular antenna or tower – are like the telephone numbers of an incoming call. They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content. Currently, **TARGET CELL PHONE 1** has IMEI 990005912200730.

9. Verizon Wireless also provides cellular telephone access to the general public, and is headquartered at 1 Verizon Way, Basking Ridge New Jersey. Providers of cellular telephone service have technical capabilities that allow them to collect data that identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received radio signals from particular cell phones ("cell-site" location information). For each communication a cell phone makes, its cellular providers can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. Many cell towers divide their coverage up into multiple sectors (most often three 120° sectors). Where this is the case, the provider can usually identify the sector of the tower that transmitted the communication. However, cell towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to the cell phone does not necessarily serve every call made to

or from that phone. Accordingly, this cell-site information allows law enforcement to determine only the general location of a cell phone.

10. In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents. A cell phone can also be used to exchange text messages with email accounts. Email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

11. The DEA Montgomery Resident Office ("MRO") began investigating **MILLERS's** drug trafficking organization (DTO) in May of 2016 after receiving information that **MILLER** and associates were involved in the distribution of large amounts of cocaine, crack cocaine, and marijuana in the Lee County, Alabama, area. To date, investigators have determined that MILLER is an influential member and drug distributor for the DTO. Agents further discovered through call record analysis that MILLER utilizes **TARGET CELL PHONE 1** to communicate with DTO leaders and other known drug distributors.

12. On October 28, 2016, DEA Task Force Officer ("TFO") Clint Lee received screenshots of text messages between a DEA CS and **MILLER,** in which the CS contacted **MILLER** at 334-524-0720 **(TARGET CELL PHONE 1)** in regards to purchasing three pounds of marijuana and one ounce of cocaine. In the text messages, **MILLER** advised the CS he **(MILLER)** was capable of and prepared to conduct the transaction.

5

13. On November 1, 2016, the CS called **MILLER** on **TARGET CELL PHONE 1**. During the recorded call, the CS advised **MILLER** that he/she would be back in town the following day, and that he/she was still interested in obtaining one (1) ounce of cocaine, also referred to as "a zip." The CS asked **MILLER** if he (**MILLER**) still wanted a "band" ($1,000) for it. **MILLER** confirmed and directed the CS to just let him (**MILLER**) know.

14. On November 2, 2016, the CS communicated with **MILLER** via text message over **TARGET CELL PHONE 1** at approximately 10:57 AM CST. **MILLER** asked the CS "how long you going to be in town?" The CS responded that he/she would be available "...til bout Saturday or Sunday." **MILLER** responded "I'm bout to leave Montgomery in 10 min and did you need the green or just the soft?" (Based on training and experience, TFO Lee knows the terms "green" and "soft" are common street vernacular used to refer to marijuana and cocaine powder, respectively). The CS responded "Just need the soft, but u can hit me up when u get back in?" At approximately 1:00 PM CST, **MILLER** sent a text message from **TARGET CELL PHONE 1** to the CS stating "I'm back but my people only have a half of a zip left until morning do u want that?" (Based on training and experience, TFO Lee assesses **MILLER** informed the CS that he only had ½ ounce of cocaine available and offered it to the CS). The CS responded "Yea that's cool, he gon let it go for 5? And if so when u be ready?" **MILLER** responded "Yea the 5, I'm grabbing it now I'm at the crib." The CS responded "so come thru in bout twenty mins?" **MILLER** responded "That Will work." (Based on his training and experience, TFO Lee assesses **MILLER** agreed to sell ½ ounce of cocaine to the CS for $500.00). Several minutes later, **MILLER** sent a text message from **TARGET CELL PHONE 1** to the CS which stated "Bra if you gone be around tommorrow imma get it where it's bricked

6

up. This here to shook up I ain't gone sale it to u like this Just wait. I wouldn't buy it if it ain't rocked up. So I Ain't gone sell it to you like this." The CS responded "You gone have it for sure tomorrow cuz if not I can grab some from my partner and make til u straight." **MILLER** responded "Yea it will be for sure." (Based on training, experience, and later events, TFO Lee assesses **MILLER** expressed concerned that the cocaine in his possession was not compressed, and he was concerned with the appearance of it.) At approximately 1:36 PM CST, the CS placed a recorded call to **TARGET CELL PHONE 1** and spoke to **MILLER**. During the conversation, **MILLER** again expressed concern to the CS that the cocaine was not compressed or "too shook up," and that he was reluctant to sell it to the CS as a result. **MILLER** and the CS agreed to attempt the transaction again the following day. On November 3, 2016 at approximately 1:39 AM, CST, **MILLER** sent a text message to the CS from **TARGET CELL PHONE 1** which stated "If you still need me I got that shit in my hands now just let me know." At approximately 10:56 AM, CST, the CS replied by sending a text message to **TARGET CELL PHONE 1** which stated "I gotcha bruh, this might be gone by tonight so I'll hit you up." **MILLER** responded with a text message from **TARGET CELL PHONE 1** which stated "K."

16. On November 4, 2016 at approximately 11:21 AM CST, the CS sent a text message to **MILLER** on **TARGET CELL PHONE 1** which stated "U think u can link round one?" **MILLER** responded with a text message from **TARGET CELL PHONE 1** which stated "Yep that a work." At approximately 12:43 PM CST, the CS sent a text message to **MILLER** at **TARGET CELL PHONE 1** which stated "Getting ready to head that way that's straight?" At approximately 12:50 PM, CST, **MILLER** sent the CS a text message from **TARGET CELL PHONE 1** which stated "Had a dr app give me 45min. I thought I would be finished been here since 1145." (Based on later events, TFO Lee assesses **MILLER** informed the CS that he was

7

delayed due to a doctor's appointment.) The CS responded "OK lmk wats up asap cuz i got this chick with me so I'm trying to make a few moves while she at work." At approximately 1:45 PM CST, the CS received a call from **MILLER** using **TARGET CELL PHONE 1,** and **MILLER** informed the CS that he was home and available to meet the CS. At a neutral location, TFO Lee and other investigators outfitted the CS with audio/video transmitting and recording equipment, along with $1000.00 in government funds. Investigators also searched the CS and his/her vehicle for drugs and contraband with negative results. At approximately 1:55 PM CST, the CS drove to 916 E Magnolia Drive, Auburn, Alabama to meet with **MILLER.** TFO Lee and other investigators followed the CS to the location and observed the CS park his/her vehicle on the street in front of the residence. Shortly thereafter, TFO Lee and other investigators began to overhear (via the CS audio transmitter) the CS engage in conversation with a male subject. Shortly thereafter, the CS departed the residence and drove back to the neutral location, followed by TFO Lee and other investigators. At the neutral location, the CS transferred a clear plastic bundle containing approximately one ounce of suspected cocaine to TFO Lee. DEA TFO Scott Kendall conducted a presumptive test on the substance, yielding a positive result for the presence of cocaine. The CS confirmed that he/she had obtained the cocaine directly from **MILLER**, in exchange for the $1000.00 in government funds. TFO Lee and other investigators again searched the CS and his/her vehicle for contraband with negative results, and concluded operations shortly thereafter.

17.   The applicant hereby certifies that the information likely to be obtained by the requested pen-trap devices is relevant to an ongoing criminal investigation being conducted by the DEA, as required by 18 U.S.C. § 3122(b)(2). Similarly, the facts set forth above show that there are reasonable grounds to believe that the records and information described in Section II

of Attachment A are relevant and material to an ongoing criminal investigation, as required by 18 U.S.C. § 2703(d). Specifically, this information will help the United States identify and locate the individual(s) who are responsible for the events described above, and determine the nature and scope of their activities.

## GOVERNMENT REQUESTS

18. For the reasons stated above, the United States requests that the Court enter an Order authorizing the installation and use of pen-trap devices to record, decode, and/or capture the information described in Attachment A for each communication to or from **TARGET CELL PHONE 1**, without geographic limit. The United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8), and does not seek GPS data.

19. The United States further requests that the Court authorize the foregoing installation and use for a period of sixty (60) days, pursuant to 18 U.S.C. § 3123(c)(1).

20. The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order Verizon Wireless, and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this Order to furnish, upon service of the Order, information, facilities, and technical assistance necessary to install the pen-trap devices, including installation and operation of the pen-trap devices unobtrusively and with minimum disruption of normal service. Any entity providing such assistance shall be reasonably compensated by the DEA, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of this Order.

21. The United States further requests that the Court order that the DEA and the applicant have access to the information collected by the pen-trap devices as soon as practicable, twenty-four hours per day, or at such other times as may be acceptable to them, for the duration of the Order.

22. The United States further requests that the Court order Verizon Wireless, and any other person or entity whose assistance may facilitate execution of this Order to notify applicant and the DEA of any changes relating to **TARGET CELL PHONE 1**, including changes to subscriber information and to provide prior notice to the applicant and the DEA before terminating or changing service to **TARGET CELL PHONE 1**.

23. This Court has jurisdiction to issue the proposed Order because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *See* 18 U.S.C. § 2711(3)(A)(i).

24. The United States further requests that the Order require Verizon Wireless, and any other person or entity whose assistance facilitates execution of this Order, and their agents and employees, not to disclose in any manner, directly or indirectly, by any action or inaction, including to the subscriber(s) of **TARGET CELL PHONE 1** the existence of this application and Order, the resulting pen-trap devices, or this investigation, except as necessary to effectuate the Order, unless and until authorized by this Court. *See* 18 U.S.C. § 2705(b) and 18 U.S.C. § 3123(d)(2). Such a requirement is justified because the Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the Order will seriously jeopardize the investigation,

including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, endanger their own lives or safety, intimidate potential witnesses, change patterns of behavior, or notify confederates.

25. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. *See* 18 U.S.C. § 3123(d)(1). As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their disclosure may seriously jeopardize that investigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 11/10/16.

Respectfully submitted,

GEORGE L. BECK, JR.
UNITED STATES ATTORNEY

Verne H. Speirs
Assistant United States Attorney
131 Clayton Street
Montgomery, AL 36104

11